May it please the Court, my name is Doug Morgan and I represent one of the appellants, Landmark American Insurance Company, and I plan to address three foundational points when analyzing the interrelated wrongful acts provision in the AIIC policy. First, the provision is being applied as a coverage limitation and should be treated as an exclusion. Second, this Court should consider all the facts in the record when considering this provision. And then third, AIIC has the burden of proof here, but it can't meet its burden based on the unrefuted facts in the record. Now first, there should be no question that AIIC is applying its provision as a coverage limitation here. It argues that pursuant to its provision, its policy precludes any coverage for the three actions that were filed and first made during its policy period. It essentially argues that the dates that those three actions were first made should be changed to a date that's prior to its policy pursuant to this provision. And pursuant to cases that have addressed provisions and definitions similar to those in the AIIC policy, this provision should be treated as an exclusion, which means it should be construed narrowly and not broadly. You know, just the first question I have, just because we have the odd truth in the record that you have one of these provisions too. We would interpret, if yours were before us, we'd interpret it equally narrowly. It's an exclusion. Yes? If we have a provision, factually here we have what would be referred to as a single claim provision. It's not exactly the same as the Interrelated Wrongful Acts, but your concept, the concept that you're asking, yes, Your Honor, if we're applying it to limit coverage, we understand that a court is going to look at it as a limitation and therefore it would be construed narrowly, you know, unless there was some specific case law that said otherwise under the circumstances. But, in this case, there's no question that AIIC is applying it as a coverage limitation. They're saying no coverage under our policy pursuant to this provision. And, in fact, in its brief, AIIC doesn't cite to any authority to support its position that it shouldn't be treated as a coverage limitation. They just simply say that, you know, it doesn't always apply as a coverage limitation, but that's exactly what they're doing here. There should be no question about that. But, the key point here is that the provision should be construed narrowly and not broadly because part of AIIC's argument in its briefing is that because they have a definition for Interrelated Wrongful Acts, the provision should be applied broadly. But, when it's viewed as a coverage limitation, which is how it's being applied here, it should be construed narrowly. I can't broadly forget narrowly. Just look at the words. I mean, the words say things are interrelated as a common nexus, any fact, circumstance, situation, or event. Do you concede that these suits would be interrelated under that plain language and you're just relying on these narrowing constructions and other principles to say we have to limit that, or do you fight that even under the plain language? I fight it under the plain language, Your Honor. In fact, the definition says that wrongful acts, they say that there are wrongful acts that are causally or logically related. And, I don't think you can skip that step, the causally or logically related. I think that's important as part of the court's analysis. And, I believe the case law that's cited on both sides of this issue demonstrate there has to be some sort of causal or logical connection between the acts or the claims to be considered interrelated. If one of the, the case, I forget if it was the second or third, but the first one that was brought is a class action. If that had been the first one filed and it was a class action, would, would that then implicate this provision? Well, it would, that, that class action, you know, I mean, it is, it's just one action in and of itself. So, I don't think it would trigger this provision, just the one case. That, that's the real question. If the Wiggins complaint had said, there is a common practice, a wrongful fraudulent scheme, that that's what Rev. Claims does, that would make it a very different case, wouldn't it? Well, we would argue that pursuant to the Fifth Circuit's opinion and ruling in the Mahat case, where they addressed the term related acts, it wasn't defined in the policy, but they defined it as meaning logically or causally connected. And in that decision, the Fifth Circuit ruled that a single motive or a single goal is not enough to make it a single act. And that dealt with legal malpractice claims, and they ultimately held that they were discrete acts that resulted in discrete losses, so they were not related for purposes of the policy that was in place in that case. And so, what we would argue here is that even if you allege that there's a common business practice on the part of Rev. Claims to assert liens in a certain way, that that in and of itself is not enough. More than a common business practice, though, what if we looked at, for class actions, there's the test of commonality. The claims have to involve common factual or legal issues. Right. So, why couldn't we say here there's a common legal issue in all of these cases about the legality of this lien practice? Well, we would argue that on the causally or logically related wording that's in the definition of their policy, that there's a decision out of the District Court of Colorado that's cited in our briefing, the Moorlane case, that defines what logically and causally related means. And logically means that one act must flow from the other in an inevitable or predictable way, excuse me, and that causally means that one must bring about the other. And so, the argument here is that just because Rev. Claims asserts a lien in a certain way in one case didn't lead them to necessarily assert a lien against a different patient in another case that doesn't have anything to do with the first case. Well, it does seem like that's their business. I mean, let me ask you, are these provisions intended for mass tort, say a pharmaceutical company, you know, someone says their drug is defective, they get sued under one policy and then a few years later now they have thousands of pharmaceutical cases? That's not my understanding, Your Honor. I don't think that's the purpose and intent behind the provision. Well, would that scenario, though, those would be interrelated cases? If lawsuit one filed under the first policy says your drug's defective and then 10,000 lawsuits get filed within the next few years? I think there could be certainly an argument that they would be causally or logically related in that fact scenario. Yes, Your Honor. Tell me again what, I mean, causal and logical presumably mean different things. Causal would be more but for, and at least if we look at the first filed action here, Wiggins, it isn't itself saying there's conduct happening in Alabama and Arkansas both. Right. But logically gets closer to the business, the whole business concept. Yeah, and there are cases that we cited in our briefing, both landmark and rev claims, that demonstrate that you can't apply the provision so broadly when the claimed connection, whether it's logical or causal, is the common business practice because what you would end up with is every time that they're sued related to their core business would be considered interrelated and then all of those claims would funnel back to the first claim that was ever made and they'd be limited to one policy limit. And in this scenario they're limited to one, would be limited to one policy limit that and the defense costs erode those limits. And that's, and those courts recognize that that's an unreasonable approach. It's just too broad. And so when they cite the Second and the Ninth Circuits that seem to contemplate that, what do you think those courts, what's the limiting principle those courts put in? I know you cited, ma'am, had our case, but there are, and the circuits are really struggling and I am too with this. So even with the least favorable circuit opinion. I'm sorry? Even with the least favorable circuit opinion, do you think you still win? And if so, what's the limiting principle that circuit courts are attaching to relatedness? I think that in those cases, the Second and Ninth Circuit that you mentioned, I think they're looking at as long as there's one common goal or one common motive that they say that that's enough to make them related or interrelated under the circumstances. But the other cases that we've mentioned recognize that that can be too broad of an approach and that's why if you view it as an exclusion as it's being applied here and construed narrowly, I think it takes it out of that framework. Thank you, counsel. Thank you, Your Honor. May it please the Court, Your Honors. I'm Joseph Adams. I'm here on behalf of Riv Claims. I'm basically going to address four separate points, hopefully. First, I want to point out is this. Much of the ruling from the district court below and much of AISC's briefing doesn't focus on the causal and logical language in interrelated wrongful acts policy. It sort of jumps straight to any and the word's common nexus. You can't simply read causally and logically out of the policy. The district court itself says policy language matters. But logically would seem to be a word you'd want to run away from because most things are logically related. It would be logically related if it's your client's company and they do just this one discrete identical thing, lean on accident victim patient when the, you know, to allow the hospital not to recover the discounted amount from the health insurer. Instead, you get the third party for the full amount. Yes, sir. No, sir. We do not run from logically. These claims are not logically related. One claim is not dependent upon the other and one claim does not flow from the other. Ms. Wiggins' lawsuit exists whether or not Ms. Hargett is ever born. They do not flow from each other in any way. Ms. Wiggins is a single plaintiff case in Alabama that has absolutely no connection to Ms. Hargett whatsoever. Let me just pick the more difficult one for you. Ms. Pledger. Ms. Pledger and who? And Ms. Wiggins. And Ms. Wiggins. Same hospital, same state, same office. They are. Yes, sir. And they have different tort feasors and they had different third party recovery sources and they had different injuries and how the lean itself was actually applied in those cases is different, which is another critical point. If you can pick any fact out and they're not interrelated, how would this provision ever come into play? No, sir. You're saying the district court would always come into play. Now you're saying it would never come into play. Two points. No, sir. I'm not. I'm not saying that. Give me an example of two lawsuits involving this issue. If we had a single tort feasor that injured multiple people that were treated at the same hospital at the same time with similar injuries, we would clearly have an interrelated type situation. What's the distinguishing feature? It's the tort feasor? No, sir. It's all the individual acts related to the claim itself. As the Fifth Circuit said in Mahat, a single motive does not make a single act. As the district court said, Rev Claim's business model is on trial here. There's no question about it. Your best cases are Mamahat. Our best cases are Mamahat, but I would also point out that there are two other cases that are extremely good on this point and I want to point out a couple of things about the Seneca case and the Miller case that they relied on. First, the Hrubacek, and I apologize if I pronounced that case wrong, from Pennsylvania dealt with debt collection and district attorney's office from multiple states and multiple different district attorney's offices. There the court said, yeah, you've got a single business motive. That's not enough. You've got different district attorney's offices. You've got different states. You've got different agencies involved. In the Ace case, the court, granted it was looking at different subpoena issues, but it came to the same ruling. Those were issued by subpoenas in that case. Those were issued by different state agencies requesting the same or very similar information. In other words, two different agencies requesting the same information. The court again said, no, that's not enough. And another point that is very critical to understand or that I want to stress to the case, the Miller case, the Fourth Circuit case, and the Wendt case, the Eleventh Circuit case, none of those cases address a major argument that we have pressed below and are pressing here, which is this. Under AIC's reading and the district court's order, RIF claims could never have coverage under this policy, ever. All it would take is a single commonality. RIF claims will always be involved. That is a single commonality. If the district court's order is correct, RIF claims can never have coverage. RIF claims will always be involved. What about a common legal issue? Not a common party or defendant, but a common legal issue. A common legal issue, to be candid with you, Your Honor, is going to exist in a lot of these cases, if not all of them. If you take, again, you're going to have a commonality of things. If you take this set of facts to any... Well, what about my hypothetical I gave to the other side, a defective drug that's sent out to thousands of people, and it's sold in different stores and with different plaintiffs, but would you say that's... And they all sue, thousands of them sue, saying that the medicine is bad. Is that interrelated? Well, Your Honor, I disagree with my fellow attorney there. I don't know that you can or can't say they're related. You have to look at the singleness of the claims. Now, granted, if you're talking in a class action situation, you've got some commonality issues there that get satisfied and people get brought into a class action. Because of all of this, you're saying we study very hard the Wiggins allegation? Yes, sir. That's one of the things I'm saying. And alongside that, we have the text, which does say it could be different claimants and different causes of action. It does, Your Honor. And if you read any and common nexus as broadly as the Wiggins claim... Excuse me, as broadly as the district court ruled in this case, if this court affirms that case, it is impossible for Rev claims to have coverage under this policy. You said that, and I think you must have argued to the district court, and it's a powerful argument, but what if the answer is you should have just negotiated a less comprehensive provision? Because, Your Honor, insurance policy... We're dealing with Mississippi law. As Mr. Morgan pointed out, limitations are narrowly construed, tightly construed against the insurer. The only proof in this case, the only proof in this case about the expectations of an insurance policy came from Rev claims CEO Brad Williams in a declaration. And he specifically said, I never had the anticipation that a single case filed against me... You could have had an occurrence policy. Occurrence policies are common, and then if the lien occurred during the policy period, it would be covered. This is a claims filed policy, which then leads to this explanation. Yes, sir, Your Honor. We could have had an occurrence policy that would cover this, but we don't. We got a claims made policy that were right here. So, no, we didn't buy an occurrence policy. Yes, we could have bought one to cover that, but no insured ever buys a policy with any expectation that their claim will, that they can't have a claim that will ever be covered. Again, under the district court's ruling, you would literally could go back to the first policy and the first claim Rev claims ever made. Their business model is not going to change, and it doesn't change. It's the same. So, this... But I think the flip side is the insurer, if they'd known there was this, this sort of gets to the issue, the alternative issue they raise. If they had known there was already litigation challenging the business practice, which often leads to a flood of copycat lawsuits, that they wouldn't have insured you. So, I mean, insurer... Or they would have at least priced in the known risk. Yes, sir, Your Honor. And on that point, the point they raise is that we didn't tell them about the Wiggins lawsuit. I won't ever... In review of this case, please focus on the application materials that they cite and talk about. Those are not landmark materials. Excuse me. Those are not AIC materials. Those are RSUI landmark materials that we submitted at that time to RSUI and Landmark for coverage again coming up when the first landmark policy was going to expire. They agreed to accept those materials. Landmark was already defending Wiggins. If you will notice in those materials, Mr. Williams did disclose other lawsuits that weren't currently being defended by Landmark. AIC agreed to accept that form. There was no hiding of the ball whatsoever in those cases. I want to also focus on a significant difference, which is how the liens are applied in each one of these cases. First of all, Alabama law and Arkansas law is not the same. In each one of these cases, Ms. Wiggins had the case filed directly against her. A recovery occurred against one of her policies for underinsured or uninsured motorist coverage, the risks. You asked Landmark to defend Pledger, right? And that is another Alabama case. Yes, sir. Mr. Williams did send this case to Landmark first. Yes, sir. But the case is resolved differently. The lien in Hargett was never released. The lien in Garrison just expired. The application in different treatments is not even the same. You're doing rebuttal to me. Yes, sir. Thank you. Good morning, Your Honors. My name is Jeff Price. I am here on behalf of Associated Industries Insurance Company, AIIC, the plaintiff in the case below, and the appellee here. Briefly, I want to address the construction issue. I think it's a red herring. I think it's immaterial because I think Mississippi Courts, in frankly every case that anyone cited, says that plain language of the policy needs to be interpreted as written. We're not asking for a liberal, expansive reading. We're saying that our definition is broader than one of the other cases. The district claims that yours is so broad that you insured this company knowing what they do, but you insured them in a way that you would never have to pay them anything. Well, the district court came up with one example, which would be if they had sued the wrong plaintiff, if they missed a statute of limitations, if they failed to execute the lien. But if they sued the wrong patient victim under your theory that it's the business model that creates the commonality, why wouldn't you be saying even that suit would be related to the Wiggins suit? Because the definition requires that the wrongful acts, which the wrongful acts are any actual alleged error, omission, etc. So in other words, the gravamen, if you will, the basis that they're saying, here's what you did wrong, is the filing the lien. They're not saying what you did wrong is taking on a collection action, what you did wrong No, I'm saying assume they filed the lien, but on the wrong person. The fact that a lien was filed is not what we're saying creates the commonality. It's the fact that the lien is the basis, that the exact same practice with respect to the lien is the basis for their causes of action in each of the four claims. The fact that the lawsuits are mirror images of one another is the commonality. Therefore, if we conclude looking at your chart that they aren't mirror images, that the first filed one, Wiggins, didn't allege a common business practice, then you lose? If that's, I mean I think that so long as there is a common, and of course, as we've sort of skirted over some of the definitions and compared them to cases, I don't know that there's one as specific as the one in our policy and the case decided. But as long as the wrongful acts are causally or logically related, have a common nexus of any fact, circumstance, or situation, then they would be related. Right, your chart. Exactly. The bottom corner on Wiggins, which all the others say common practice, this is what they do, in Wiggins that wasn't alleged. They allege, they may have not alleged that there is a common practice, they allege the common practice in Wiggins without question. Explain that distinction. So They didn't allege this is their business practice? Right. Of what? They did allege what that means? They allege the business practice as was alleged in each of the four. And whether it's the business practice or it's an action that's part of their business practice, the action is to disregard insurance, negotiated rates, to go file a lien against the tort fees or whatever third party claim they have. That's the common, it's the exact same thing. And in fact, the Wiggins lawsuit and the Hargett lawsuit, as the court noted, was filed, was treated in the same hospital, with the same contract with Rev Claims, with the alleging the same Not Hargett. Pleasure. I'm sorry. Wiggins and Pleasure. Yeah, I apologize. Were treated the same, were referred to Rev Claims, they filed a lien, and both of those by the same plaintiff's attorney and defended by the same defense attorney. Did you argue below that even if Hargett and Garrison aren't related, Pleasure and I think both our briefs here and below, I think there's three outcomes that could come from this case, obviously. One would be that these are four separate and unrelated lawsuits. And each, interestingly, if I may sidetrack for just a moment. Come back to that. I will, okay. But let me finish that because I'm not good at remembering things. But we also, I think the second scenario would be what the district court concluded, which is obviously what we're advocating in, that these are all, there's really no way to divorce any of the four from one another. But at a minimum, you've got two Alabama lawsuits that are basically the exact same lawsuit, and candidly, you have two Arkansas lawsuits that are basically the exact same lawsuit. So if you were to distinguish jurisdiction, hospital, I think are the only two distinctions there. And our definition of interrelated wrongful acts would say that those are irrelevant distinctions because different parties are irrelevant and different venues are relevant. But that would be certainly, and that bears out in the course of conduct of the parties before they decided to choose sides on this issue. Keep in mind, when this claim came in, and one thing I do want to. Wait. Course of conduct bears out option three. Pleasure and Wiggins are related, other two. Correct. Correct. But you were going to make a point earlier before you gave me the three. What was that? And again, back to not being good at remembering what I was going to say, but the point being is when these cases came in, in interpreting the definition of interrelated wrongful acts, at that time, AIIC was not aware of the Wiggins lawsuit. AIIC has one limit of liability of $2 million, whether it's aggregate or per claim. So interpreting these as one claim, the three at the time, as one claim, actually limited the number of deductibles. It saved Rev claims $50,000 to $25,000 deductibles. Rev claims didn't object, didn't protest about treating it that way. In no way did it protect AIIC from liability. In fact, if you carry that forward, if there had been a subsequent lawsuit filed after FACTS, its position would have said, those are ours. It was only after it learned of the original Wiggins lawsuit that it said, well, wait a minute. We have, again, a third of these we've already determined to be interrelated, which happens to have been filed before. Similarly, when the lawsuit came in to Rev claims and its agent, both emailed Landmark and said, Pledger and Wiggins, these are the same lawsuits. I'm paraphrasing slightly, but not significantly. These should be treated as the same claim under the same policy. And while Landmark certainly reserved rights, and I'm not saying that they didn't raise this point initially, they certainly agreed to defend and acknowledge that there were commonalities in Pledger and Wiggins. So from the course of conduct and the sincerity of the parties in treating this before these AIIC treated them consistently and not with a position to escape coverage. In fact, it's a position to expand coverage. And importantly here also, we're not arguing that there's no coverage. We're arguing that it relates back. There will be coverage under the AIIC policy. There's no allegation that limited liability is an issue. I don't think it is. I mean, going back to the policy definition, what significance do you give to causally related? I mean, you're logically related. I think you're saying it has to be targeting the same business practice, alleging the same business practice is illegal. So I would say, well, if you read the cases that they've cited, some of those cases would say a causal connection is greater than a logical or other connection. So I would say that would be a more stringent burden. Having said that, we still have causation here, which is the practice of filing a lien in the lawsuit was the cause of the lawsuit, was the basis of the lawsuit. So I think you still get there. And even under the cases that don't have the logically connected. And unlike Mamotte, if I'm pronouncing that correctly, by the Fifth Circuit, this does define it. And while they say that Mamotte defined it similarly, what Mamotte said, I think, is that they're related if they're legally or causally related. Well, then you get into questions of what does that mean? Well, AIAC goes further and says here's what that includes. It includes all wrongful acts that have a common nexus of any fact, circumstance, situation, or event, or which are the same or related. And it doesn't matter if there's some courts that said, well, you have different claimants, so therefore these are different claims. Well, we address that in here. So I think any of the cases that they have cited are distinguishable. You know, the Berkholder case that they cite from the Southern District of Mississippi, the Mamotte from this circuit, and the Berkholder case are the two primary ones that they advance at least below. What's wrong with the Mammoth, whatever you pronounce it, same bank, same attorney, same misconduct, looks a lot more same than different states, different laws, different hospitals. So, again, first of all, we have a definition that I think is more. The language of the policy. Exactly. That first. But second, what the court said, and I'll take the court at its word, is that these actions by the attorney were completely separate instances and actions of malpractice connected only by a common motive of increasing fees. So if, for example, and I'm always dangerous getting into hypotheticals when you're talking about insurance, but if Rev claims had five different business models, practices, procedures, et cetera, and all of those were to generate more revenue for the company, well that motive, according to at least Mammotte or Mahat, would not get them there. But, again, and that's where Seneca in the WMS case out of the Ninth Circuit talk about, which are most factually similar, Seneca out of the Second Circuit, you had separate plaintiffs or separate claimants. You had separate transactions. You had separate horse shows that they were wanting to have. And in both of those instances, the insured denied and used this mileage rule that they refer to as the basis for denial. Both separately brought suit saying, well, you wrongfully denied my claim. You wrongfully denied my application. And the court said that that practice, that the hook was the misapplication or the use of that mileage rule. And similarly in the WMS case, you had automobile dealer financer, which allowed its auto dealers, independent auto dealers, separate dealers, to use a policy that would allow the dealers to represent to borrowers that they were not having to pay finance charges or some type of a closing charge, but they were rolling those in to the loans, creating higher interest rates, thereby really making. It's their answer that we have to do a deep dive into what the allegation was. And in each of those cases, the original first filed allegation did express this larger practice and plan, which then encompassed the later ones, whereas here the Wiggins suit is a very narrow one-shot factual suit. Admittedly, I haven't committed all of Seneca to memory. I don't believe that they're in that case. I believe the focus was the individual facts, the individual transaction by each of the plaintiffs. WMS, I candidly don't recall whether an individual borrower had said, you know, you did this to me or. . . Did St. Bernard Parish influence the way we look at this?  And there the parish had one condemnation policy, and then it led to all these wrongful seizures, right, or demolitions. So you have an originating single event or single wrongful act, and then therefore necessarily all the rest are related. But here they insist this is just their business, and they do very different suits all around the country, none connected. Well, so Mr. Williams' affidavit, which I think is what they're talking about, is the only record in the proof or proof in the record on that point. He both says that this is our core business. He says it in one that's a very conclusory allegation driven by the facts of this case, I think. But more importantly, he then goes back. He has two affidavits. One says we may file a lien to collect from third parties. The other one says we will. But regardless, it is that practice. And they certainly can engage in it. This is a policy issued to, I believe, a law firm, but an insured Mr. Williams' company. And as an additional insured, Rev. Claims was added. So there's certainly no illusory coverage here. I mean, I think I could, I believe, sit here and espouse numbers and numbers and numbers of instances where there could be coverage under this policy. You answered that question originally by citing Judge Jordan's example of a mistaken lien, you know, getting someone's name wrong and putting a lien on them. What other examples do you have where there would still be coverage if we read this your way? I would assume that if they get the file in and don't timely assert the lien and the funds go to the claimant, if they fail to timely file a lawsuit to enforce it, if they take actions in violation of, now they say they're not a debt collector, but the Fair Debt Collection Practices Act or some other federal, state, or other law that is other practices that they engage in, which they don't. But if someone said they're violating the Federal Debt Collection Act because of filing these liens, but you're saying if it related to the follow-up regarding it? An abusive call of what? I think there's plenty of scenarios. But, sir, I would have to say that if the violation is the filing of the lien, yes, I would be here arguing the same thing I'm arguing now. I do think your Honor referred to the chart at 456 of the record. I think that's instructive. I don't think the fact that there wasn't an allegation that there's a pattern is not material when there is an allegation of the same conduct that's in the pattern. I believe the cases that we have cited are similar in fact. Admittedly, there's a lot of cases all over on this issue. Interestingly, one of the secondary sources that Revklane cited in its reply brief, I think the proposition that this is a confusing issue, in there says that burden is rarely determinative of these issues. I think that's a red herring. All we're asking the court to do is look at the policy language, interpret it as written, and apply the facts that we have, as the district court did. And, again, I think that if you look at the case law that is cited by Revklane and Landmark, it would demonstrate that to the extent there's been a departure from, which I think is the minority of the application, it's usually different policy language. And very briefly, in the reply brief of Revklane's, they allege or assert that we haven't addressed the issue of the Connect case and of the South Dakota Network case, which held that the term common nexus had some ambiguity. First of all, it didn't have the language that's in ours that goes forward to help provide context and definition to that. And those are obviously district court cases from other jurisdictions interpreting different facts. But I think, interestingly, from Connect case, the court said, even using the broad definition, because they found two possible definitions, and the connection was they required a causal connection. Since it wasn't defined, they said it has to be defined. It could be defined as causally or not causally. They're going to use causal connection. And the court, and here we already have definition that says logic or causal. But the court said, drawing on these definitions, we conclude that a common nexus requires a link of acts. For the acts to be deemed interrelated, they need not be identical, but they must be sufficiently related or similar. Even if you were to, say, use the ambiguity argument and you were to use Connect's definition, we absolutely have similar facts and similar bases for the lawsuit, not just the same party. Thank you. Your Honors, I think it's critical to point out that the only evidence submitted in this case are the declarations of Brad Williams. There was no evidence submitted by AIC as to whether or not these were independent business decisions and not interrelated, commingled things. There was no effort to strike those. There was no effort to get other contradictory evidence. That is the only evidence in the case as to whether these are independent business decisions. That is it. That is undisputed. Seneca from the Second Circuit, Miller from the Fourth Circuit, Wendt from the Eleventh Circuit, and the Ninth Circuit case that was just discussed, none of them have an undisputed fact that they're independent business decisions. That is literally a distinguishing fact between every other case. When I look at the – I'm looking at the excerpts in your brief of the declaration, I know he says these – he has these statements about they're all different situations, but then when you read through it, he says when third-party recovery sources exist, REV claims will assert a lien on that third-party source, and the hospital may be able to fully recover its charges instead of – and it goes on and on. When you actually look at his specific descriptions, it seems like it's a standard policy. No, sir, Your Honor. First of all, they have to determine is there a third-party source. They have to go through a common business practice, which again – Well, of course, but you're never going to have a lawsuit if they don't even serve the lien. But that goes to the whole point as to why they're independent business decisions. There's no lien and there's no lawsuit. In some cases, they never assert it. In others, they do. That's demonstrated by the fact that all of these were differently resolved at the end. The next point I want to make about, Judge, the opinion below is this. Even under the judge's example below, wrong liens, wrong parties, wrong recoveries, there's still the single commonality. Under every example cited, REV claims is still involved. REV claims has a contract with the hospital. There's no coverage. Thank you. Thank you all. It's a specialized difficult issue, and you've been very helpful in arguing it. Last case for today is –